Good morning, Your Honors. May it please the Court, my name is Joshua Lipschutz and I represent the petitioner in this case. It is undisputed that my client meets all the substantive requirements for asylum, yet she was denied categorically the ability to even apply for asylum for one reason alone, having nothing to do with her substantive eligibility. She entered the country without having illegally reentered the country, and without the issuance of a reinstated removal order, she could have applied for asylum. That is exactly what the Refugee Convention prohibits. As this Court held just two months ago in the East Bay Sanctuary case, in an opinion written by Judge Bybee, quoting Article 31.1 of the Refugee Convention, Judge Bybee wrote, quote, in accordance with the convention and protocol, Congress require the government to accept asylum applications from aliens, irrespective of whether or not they arrived lawfully through a port of entry. This provision reflects our understanding of our treaty obligation not to impose penalties on refugees on account of their illegal entry or presence. Kagan. Could Congress, consistent with our treaty obligations, have said that someone subject to a prior deportation order is ineligible for asylum and can apply only for withholding, without making the distinction between whether the second entry is legal or illegal? Congress could not have done that consistent with our treaty obligations. But what Congress could have done is expressly repeal or abrogate our compliance with the treaty in those circumstances. So there are cases in which Congress has used language to that effect, language where the Court has said, where Congress has said, notwithstanding any other provision of law or notwithstanding our treaty obligations, we establish the following principle. That's not what Congress did here. And, in fact, in the Perez-Guzman case decided by this Court, this Court decided that Congress had not, in fact, expressly abrogated its treaty obligations by enacting Section 1231A5. That brings us to the important point of Perez-Guzman. And it seems to me that virtually or maybe all of your arguments are foreclosed by that case, because the issue presented there is really the same issue as presented here, albeit with different flavors of argument. So I'd like you to address that. I had a feeling Perez-Guzman would come up today. It would be a surprise if it didn't. We think there are two very good reasons why Perez-Guzman does not control this case. Number one, the charming Betsy Doctrine and, in fact, the entirety of the Refugee Convention and Protocol was not discussed or considered by the panel in the Perez-Guzman case. And this Court has held in a variety of cases, including the Miller v. CPMC decision from 1994, that it is a venerable principle that a court is not bound by a prior decision that failed to consider an argument or issue the later court finds persuasive. But let me ask about that. First of all, it was definitely squarely presented in amicus briefing in Perez-Guzman, correct? There was one amicus brief that raised the issue before the panel, but the panel did not. If you read the panel's opinion, it doesn't mention it. I understand it didn't say it, but the issue was raised, was it not? It was raised by an amicus, yes. It was not raised by the parties. Isn't the charming Betsy Doctrine a variation on arguments with respect to the level of review and Chevron deference? I don't think so, Your Honor. I think it goes to whether the statutes can be reconciled. And, Your Honor, Judge McEwen has issued several opinions explaining that the canons of statutory construction must be considered at step one of Chevron in determining what the statute says, not in determining what level of deference the agency gets. Perez-Guzman held that the two statutes, 1158A1 and 1231A5, are essentially irreconcilable, and so it deferred to the agency discretion. But actually, the statutes are not irreconcilable. If the Court were to apply the charming Betsy Doctrine, which is a very well-established canon of statutory construction that says that you interpret immigration statutes to be consistent with the Refugee Convention and Protocol, among other treaties, then the statutes are easily reconcilable because there's nothing in 1231A5 that expressly repudiates our treaty obligation to allow aliens to apply for asylum. And, in fact, the very same statute that enacted 1231A5, IRIRA from 1996, actually amended 1158A1 and changed it to say that any alien, it actually added the word alien, that any, any alien present in the United States can apply for asylum. So, actually, if the Court were to apply the charming Betsy Doctrine, which the Perez-Guzman panel did not, there is no need for Chevron deference because the statutes are reconcilable. Now, if the ---- Kennedy, I shared Judge McEwen's issue or problem stemming from Perez-Guzman. I mean, we can't ---- if Perez-Guzman holds something and you've got a slightly  I'm looking at footnote 10 to Perez-Guzman, where the Court in Perez-Guzman says, we do not decide the issue as to whether or not what would happen if subsection 2A, or rather 2D, is invoked for someone who's previously applied for asylum, has been denied, and then has been deported. That issue is still open. That's exactly right, Your Honor. I'm trying to figure out, in this case, what do we do with the testimony of your client, found by I.J. King to be truthful. That's right. She had a plausible asylum claim when she came in the first time. She didn't apply for asylum. The reason she didn't apply for asylum, she says, and we're compelled to believe her is, they just signed, gave her some papers to sign, didn't tell her she could. They just sent her out of the country. Can we treat her, within the meaning of footnote 10, as having been denied the opportunity to apply for asylum, and then to come within that footnote? Yes, Your Honor, and that was going to be my second reason as to why Perez-Guzman does not control here. Perez-Guzman, in footnote 10, expressly left open the question of what would happen in this exact circumstance. Well, no. No, that's not right. That's not what it left open. Well ... Read it clearly. It's not what it left open, but you might extrapolate. I think it is, but ... As I read it, and you can correct me to the degree you disagree with me, as I read it, Perez-Guzman says, what we leave open is, when someone comes into the country, applies for asylum, is denied asylum, and then is removed, and now comes back in, does capital D provide an exception that overrides the general ban? That's what I see as left open. Well, that is one thing that was left open by the footnote, but I think the footnote is broader than that. The footnote says that the Court in that case had, quote, no opportunity to determine how section 1158A2 capital D might affect 1231A5 in a case where those two provisions are actually in conflict, and as Your Honor knows, 1158A2d deals with changed circumstances. But it deals with changed circumstances only with respect to prior application and denial of asylum and the one-year ban. That's correct, Your Honor, and so it's not only that you had to apply the first time, it's also the one-year ban. If my client ... But I think limited to those two things, if I'm just looking at the text of the statute. Well, but what the statute did was it exempted from being barred from applying for asylum anyone with changed circumstances. The only categories of people who were not allowed to apply for asylum at the time were people who had missed the one-year ban, who had previously applied and been denied, or who could be deported to a safe third country. The safe third country point is really irrelevant because that doesn't really happen. But the people who were not allowed to apply were people who were subject to a one-year ban or people who had previously applied. All of those people, Congress declared in A2d, all of those people, their eligibility was renewed if there were changed circumstances. And so what Congress was doing in A2d ... But the baseline there is where you've been able to apply, and here, I think the concern I have is that you've characterized this as emasculation of our treaty obligations because you've denied someone the ability to apply for asylum or arguing changed circumstances, but your client was here and could have applied for asylum. The difficulty now is having not applied for asylum, having been removed and now illegally coming back, that's a very special circumstance. Well, but again, it brings up the concern that Judge Fletcher raised, which is did she really have the opportunity to apply for asylum the first time? The record reflects that she did not. The IJ found her credible on that. It was a clear due process violation the first time around. She was told to sign papers and sent out of the country with no ability to actually apply for asylum. So I think ... According to her testimony, there was no credible fear interview. There was nothing. There was nothing. That's right. She was sent out of the country. This was a woman who had been subject to sexual abuse and other atrocities in El Salvador. She ... It's worth pointing out that she then went back to El Salvador and tried to build a life. This is not someone who kept trying to just come back to this country. She got married. She joined a church. She tried to fight against the MS-13 gang. She tried to reduce the gang violence in her neighborhood. She joined forces with the police to try and stop the gang activity in her neighborhood. And only then, due to a completely new circumstance, was her life threatened by the MS-13 gang, the life of her and her children. It's only then that she decided to come back. So there's this possibility here, for example, one of your concerns was that this construction would result in only lawbreakers being disadvantaged. But I think we've just run through various scenarios where that wouldn't be the case. And so, for example, my understanding is that there are situations where DHS decides not to reinstate the order, for example, so then you don't have the order. Well, respectfully ... Let me ask you, is that, as a matter, as a legal matter, would that not be a circumstance which would then permit you to apply? If the prior removal order were rescinded, that would allow her to apply. But that doesn't ... I mean, frankly, that just doesn't happen. It happened in the Maldonado case because this Court looked like it was going to rule against the government. Well, you can't say it never happens. I mean, you ... Well, my client asked for that, actually, in this case. She asked for the reinstatement order to be removed, and to this day, we have not heard back from the government on that. So at least in this case, that's not a remedy that's available. Well, we can ask the government. Maybe they want to ... That would be terrific. ... hold in an abeyance or rescind it or withdraw it or basically not reinstate it. That would be terrific, Your Honor. I'm hoping that they will agree to do that. There's certainly no good reason to keep this woman from having asylum. On this point, it occurs to me that the premise or a premise for Judge Fischer's opinion in Perez-Guzman was that the government would exercise its discretion appropriately where the equities were proper and not reinstate it. But this case tells me that at least in this case, they didn't do as Judge Fischer expected  That's exactly right, Your Honor. In fact, Judge Fischer expressed great concerns in his decision about situations just like this one where the equities were clearly in favor of the Petitioner and expressed the hope and expectancy that the government would take that into account. The remarkable thing about this case is that my client actually sent a letter to the government asking for them to rescind her reinstatement order just two weeks after the Perez-Guzman decision came down. So two weeks after Judge Fischer said, that's what we hope the government will do, she sent a letter and heard nothing. So you have no answer yet? No answer. That's right. Do you want to reserve your remaining time? I would, although if there's one more question, I'm happy to answer. I just want to say, I think you do have your answer. It's this case. That's exactly right. We effectively do have our answer. Thank you. May it please the Court. Song Park for the Acting Attorney General. Good morning, Your Honors. Good morning. Good morning. Your Honors, as you have previously noted, the precise question at issue here, namely whether asylum remains available for individuals of whom a prior order of removal has been reinstated is the precise question that was answered in Perez-Guzman, and the holding of Perez-Guzman should therefore bind this petition for review as well. Can I ask you why the government did not do as Judge Fischer expected the government to do in cases that present strong equities such as this one? Your Honor, the record is unclear as to what may or may not have motivated the DHS, but I think it is important to note several things. One, that there is no response necessarily, so there is that. Let's stop there. Right now it's in limbo. Are we in a situation where if there is no response that it's deemed reinstated? Is there a regulation to that effect? I do not believe so, Your Honor, necessarily, but again, I don't want to. Maybe we shouldn't be here until the Attorney General or whomever is the appropriate authority decides whether or not to exercise discretion and to reinstate or not reinstate. Do you know the status of that request? I don't right at this moment, Your Honor, although we are certainly looking into it. Your Honor, the only point I guess I'm raising on that is I wouldn't want the court to necessarily read into an implication of a negative determination or a denial solely by the silence. I mean, that's really the only point I'm making. But it seems odd to me. We're now taking up all this time and this appeal, and we don't have an answer because one of the things that Peres Guzman made clear, or one of the categories of individuals who would still be able to be advantaged from the Peres Guzman decision is if DHS didn't reinstate the prior order. So if we don't know whether they reinstated, well, we know they haven't given an answer, so I take on faith counsel's representation there, and you've indicated you don't know of anything otherwise. So it may well be that she would fall into the advantaged category left open by Peres Guzman, but we don't know the answer to that because the government has, for whatever reason, chosen not to answer her request. So why wouldn't we want to know the answer to that before we proceeded? I think, if I'm understanding Your Honor correctly, I think there is no question that at this request of this case is that there is a reinstatement order that has been issued against the petitioner, so for... Yes, I think we have a de facto answer. You reinstated it because without that, this case wouldn't be in this position. Right. But de facto just means there hasn't been any specific response to her request to not reinstate, correct? No, I think it's that to withdraw the reinstatement order and to instead then place her on 240 proceedings instead, is my understanding, and there are several points that's reflected in this record that may perhaps suggest why there wasn't a positive answer that came immediately, one of which is that part of Congress's intent in providing for the reinstatement provisions was to create a streamlined process to address the problem of individuals who were re-entering the country unlawfully after being subject to an order of removal. So it may very well be the case that perhaps that consideration would no longer, by having gone through the entirety of the removal proceedings, at which point the agency had already expended considerable resources and time into this matter, that that could very well have been one of the considerations that it weighed. Excuse me, do you agree that if we take her testimony as true, which the IJ did, that the first time she came to this country, the actions of the government prevented her from applying for asylum? Well, Your Honor, the problem, though, is that the record doesn't clearly or indistinguishably establish that to be the case. Now, why is that so? Because she says they just handed her some papers to sign, didn't tell her what they were, and then said, you signed papers and you're out of here. That's what she says. And she does also assert, as Your Honor noted previously, that had she known about the availability of asylum at that time, she would have certainly asserted it. But in the record, when she... Excuse me, I realize it's hard, because of the TV and so on, we talk over each other without intending to. Does the government have any obligation for someone coming into the country to ask them, like, do you have any reasonable fear and so on? Yes, Your Honor, but... Well, it sounds as though they didn't do that. But according to all of the documentation in the record, including from the 2008 proceedings as well as the 2014 proceedings, at the initial level, when she was being interviewed by asylum officers, there was no indication that she asserted any type of fear. Now, I understand the claim is that she wasn't given the opportunity or was made aware of that availability in 2008. That's my question, right. It sounds to me, from what her testimony is as to her first illegal entry and then her deportation or removal, they did not inform her of the possibility of asylum. They just kicked her out, which strikes me as not fulfilling their obligation and strikes me as, in a practical sense, preventing her from applying for asylum, even though she had at least a plausible case. But, Your Honor, it is important to note that when she returned in 2014 and then was placed back in proceedings, and then at that point she asserted that she was afraid to return, she was then given an interview with asylum. I understand that perfectly. But what I'm interested in is what happened the first time. Were you linking testimony from the second time to the first time? Just continue your explanation, if you would. I'm sorry, I interrupted. No, that's all right, Your Honors. Please ask me any questions. No, I think the government's point only here is that, to the extent there is some question as to why this, her case, because I think the petitioner here is telling the court that if someone in her circumstances could not get the government to exercise its discretion to withdraw the reinstated proceedings and instead put her into normal 240 proceedings, then who could ever meet this sort of standard? But I think that claim is a little bit belied by the record itself because it's important to note that all of the documentation with respect to her interview in 2008 with any of the immigration officers, as well as in 2014 with the asylum officer, in the context of her credible fear interview, indicate that she had no other fear aside from the one that was based on the MS-13 claim that is at the heart of her claim currently. So in other words, there is some question, if she would have asserted that fear in 2008, had she been allowed to have that opportunity to do so, there is a little bit of a question as to why she was unable to do so in 2014. And that isn't to impugn necessarily her credibility or anything of that nature. I think what I'm pointing the court's attention to there is just there are some things in the record that perhaps gave the government pause in terms of exercising its discretion to withdraw the reinstatement proceedings. And again, the petitioner is not... Excuse me for interrupting. I'm trying to understand what you just said. When she comes in the second time, she talks about the problem with the gang. And you're saying, well, but she didn't talk about the problem with the gang the first time. And therefore, there's a reason to think that the first time around, she wouldn't have applied for asylum. But... No, Your Honor. That is not what I'm... What did you say then? What did you mean? So in 2008, when petitioner entered, at that time, her claim was based on domestic violence and physical abuse claims tied to her parents as well as her neighbors. And she said, I would have applied for that at that time, based on that claim, on that basis, but for the fact that I was never given the opportunity to do so. In 2014, when she returned, she asserted, I am in... Myself and my daughter both are in danger because we are being threatened by gang members for being informants on behalf of the police. And so, of course, given that claim, they put her forward to have an interview with an asylum officer. And at that time, the asylum officer asked her in various ways, do you have any other fear? Were you harmed any other ways when you were in El Salvador? Did you have any other claims on any other basis on which you would be able to be eligible for persecution? And for all of those questions, she answered, no, no, no. And then when the asylum officer went ahead and summarized what she believed to be her claim and then asked, is there anything else you would like for me to add into this summary? The petitioner responded, no. And I think there is some consideration if she would have asserted that claim as early as... Her first separate asylum claim as early as 2008. I think the fact that she didn't allude to it at all or mention that it was a source of fear or harm or anything of that nature in 2014 when she was before an asylum officer could have been another factor that the government, that the DHS weighed in terms of trying to figure out whether this was one of those cases that warranted the exercise of its discretion. And her daughter has been granted asylum? Correct, Your Honor. Because her daughter was not present with her when she... In other words, she was not removed subject to a different removal order previously. She would not, in other words, be considered an illegal re-entrant. How would you then square your position with our recent case in the East Bay Sanctuary where we said that the denial of the right to have asylum based on illegal entry would violate the Refugee Convention? I think East Bay... In East Bay, that court was particularly concerned with the fact that the executive was trying to do something that it has expressly precluded from doing, which is through its own action attempting to amend specific provisions of the INA. And because that's what it was doing, something that is completely in the purview of Congress, that that is part of the reason that it was acting improperly. But in making that ruling, Your Honor, it's important to note that the court very carefully in East Bay stated that it was certainly not holding that the legal entry status of someone could never be used as a basis for moving forward in a removal action, Your Honor. It's just that in East Bay, the problem was that the executive was trying to do it in contravention of what the INA provided. If Congress had provided and if Congress had passed legislation that provided the same action, it's unclear whether the same result would have been reached. So we have a situation where the mother and the daughter are factually in the same situation, correct? Correct, Your Honor. So the daughter gets to stay and the mother would have to go back to El Salvador despite being in the... No, Your Honor. Pardon? It's important to keep in mind, Your Honor, that withholding of removal is something granted to petitioner that precludes her from being returned to El Salvador so long as the same conditions underlying her claim of harm exist. But she's always kind of in this never, never land with the withholding of removal because it doesn't give you the same finality rights that asylum would give you, correct? Well, it doesn't give you the extensive benefits that asylum gives you. In other words, no, you can't adjust your status to become a naturalized citizen. But certainly... As someone who's only got withholding of removal, can she get a green card and work? She can work, yes, but she cannot adjust her status. In other words, no, she cannot be eligible for a green card. But, Your Honor, it's important to keep in mind... Wait a minute. I think I just heard two different things. You said she can work but she's not eligible for a green card? Yes, Your Honor. And a green card, you don't need a green card in order to work? No, Your Honor. Okay. No, Your Honor. There are categories of both immigrants and non-immigrants recognized that don't require you to have lawful permanent status before you are eligible for work. In fact, there are procedures or regulations that are in place that the petitioner here would be able to allow her to work legally in the United States. I think I just want to point out what is important to note, though, is that there is a very strongly and clearly expressed interest of Congress. The reason her situation, the petitioner's situation, is distinguishable from that of her daughter is that, as all circuits have recognized, Congress expressed in passing EURERA in 1996 a very strong interest in the concern with individuals who had been removed, subject to a removal order, and then continued to unlawfully cross back into the United — reenter the United States. And Congress made clear that this concern — and, again, the Fourth Circuit, recent Fourth Circuit decision in Lera Aguilar recognizes this as well — that concern as to the issues with unlawful reentry is a sufficient and legitimate claim on which Congress may have — that's why Congress intended to treat folks who are subject to reinstatement proceedings differently from those who may be going through removal proceedings for the first time or otherwise going through a normal 240 proceeding. You don't have the benefit of the timing lights that we have in the courtroom, so I want to let you know your time has expired, but I do want to give you an opportunity to sum up if you would like to do so. I think — just two points I would say very quickly, Your Honor. It is important to note that there is the discretionary nature of asylum, that the Supreme Court has plainly recognized that asylum is a discretionary form of relief, that even if you met every eligibility requirement for that form, you could nevertheless be denied. And so that is a purely pregatory form that is available, and that's the reason why asylum is not required to be the sole mechanism through which Congress is meeting its international obligations for the Protocol on the Refugee Convention. And the other thing I would just very quickly point out to Your Honor, again, is to reiterate that Perez Guzman is binding on this case and has answered the question precisely at issue here for this particular petitioner. And there is no higher court of — there's no court of higher authority that has overturned or otherwise undermined the rationale in that decision, and in fact both the Supreme Court has denied the cert in Perez Guzman as well as this Court denying both a panel and a hearing petition en banc in Perez Guzman. Thank you. So thank you, Your Honors. Mr. Lipschitz, you have some time for a rebuttal. Thank you, Your Honors. Just a few points. Asylum is a very different status from withholding of removal. Withholding of removal, you're still an illegal alien. You're subject to a removal order. You can be deported at any time to a country other than El Salvador. So if somebody else was willing to take her, the government can send her away from her children. You can work, but in order to work, you have to apply every year for a new permit from the government. The government takes about five months to get that permit to you, and you can't work when you don't have it. So in effect, you can't hold a stable job. It's completely different from holding a green card. I'm very surprised to hear opposing counsel seemingly challenge the factual record below about what happened with respect to my client's first entry into this country. In front of the immigration judge, the government stipulated to the facts that were stated by my client as to what happened to her the first time around. And it's in the record. CAR-245 is a transcript of the June 1, 2016 hearing where the government said, with regards to paragraphs 1 through 23 of the declaration, I would ask that those be given full weight. And this is the government speaking? Was that the government speaking? It was our lawyer speaking. But the government stipulated to that, and that's in the record below. So I'm surprised to hear that being challenged now. The letter that we sent asking for the rescindment of the reinstatement order, we sent that letter on September 5, 2016. That's two and a half years ago. We have not received an answer to that. I'm confused by opposing counsel's argument. On the one hand, she's saying that we don't know what the answer to that will be. But on the other hand, she's got a litany of reasons that seem to be invented post hoc as to why the government seemingly denied the request for rescindment of that order. So which is it? Has the order been denied? Or is it still subject to being granted? If it's subject to being granted, then let's wait and see what the answer is before we proceed with this case. Was this case ever sent to mediation? No, I don't believe so, Your Honor. Thank you. The last point I would make is with respect to asylum being a discretionary grant of relief. That is true. It is discretionary as to whether the Attorney General grants relief. It is not discretionary as to whether someone is eligible for relief. Section 1158A1 is very clear, as amended by Congress in 1996, that any alien, any alien in this country has the ability to apply for asylum, even though it is discretionary. And as Judge Bybee said in this court just two months ago in East Bay Sanctuary, quote, it is the hollowest of rights that an alien must be allowed to apply for asylum if another rule makes her categorically ineligible for asylum based on precisely that fact. And that's why East Bay Sanctuary is so squarely on point here and why it changes the analysis in the context of this particular case. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. Thank you for appearing by video, Ms. Park. The case of RSF v. Whitaker is submitted.
judges: McKeown, W. Fletcher, Murguia